STATE OF MAINE
PENOBSCOT, SS.

SUPERIOR COURT
CIVIL ACTION
Docket No. CV-03-73

FILED & ENTERED
SUPERIOR COURT

FEB 24 2004

PENOBSCOT COUNTY

Torvic Vardamis,
Plaintiff

v.

Decision and Judgment

Amy Smith et al.,
Defendants

DONALD L. GARBRECHT
LAW LIBRARY

MAR 8 2004

Following the entry of a default issued by the clerk against both defendants, on January 5 and 14, 2004, hearing was held on the plaintiff's damages. On both hearing dates, the plaintiff was present with counsel, and the defendants appeared through counsel. As part of the evidence at trial, the parties submitted a considerable amount of documentary materials (mostly medical records) that the court has reviewed.

On June 17, 2001, the plaintiff was operating his motor vehicle on Union Street in Bangor. He was stopped, waiting for a vehicle immediately in front of him to make a left hand turn. Acting in the course and within the scope of her employment with defendant Performance Finishes, Inc., defendant Amy Smith negligently drove a vehicle into the rear of the plaintiff's vehicle. She was traveling at a considerable rate of speed. The impact from this collision caused the plaintiff to strike the rear of the vehicle for which he had been waiting. The plaintiff did not suffer any contusions or lacerations from the impact; he had some limited pain in his lower back, ankle and hip, although those problems healed unremarkably; and the damage to the plaintiff's car was not extensive, and the car was still operable despite the collision. (In fact, he continued to drive it for several months following the accident without the need for repairs.) However, the impact resulted in an aggravation of a pre-existing injury to the musculoskeletal area of his lower

1

cervical and upper thoracic back. The plaintiff sustained that pre-existing injury in an unrelated motor vehicle accident that occurred in March 2000. This aggravation constitutes the most significant injury to the plaintiff arising out of the June 2001 collision and was the focus of the parties' presentations at trial.

The damages claimed by the plaintiff consist of past and future medical expenses, (including chiropractic expenses) and past and future pain, suffering and loss of enjoyment of life. He makes no claim for lost wages, lost earning capacity or property damage.

Between the March 2000 accident and the time immediately prior to the June 2001 accident, the plaintiff had enjoyed partial – but not complete recovery – from the injuries arising from the former. He underwent two courses of physical therapy, one between May and July 2000, and the second from October to December 2000. According to the PT records, the plaintiff gained nothing from the first course. However, the second set of sessions, which appear to have had a strong educational component for home exercises, resulted in a decrease of pain in the plaintiff's back. Pursuant to a referral from his physician, Dr. Bjorn, in January 2001 the plaintiff began to receive chiropractic treatment with Dr. Arsenault. This involved frequent sessions (more than once a week on average), through the date of the motor vehicle accident at issue here. Then, following that collision, that treatment has continued, although with decreasing frequency, through the present. As of April 2001, Dr. Arsenault reported considerable improvement. However, at an office visit with Dr. Bjorn that month, the plaintiff reported chronic pain that substantially limited his activities. Dr. Bjorn diagnosed chronic myofascial pain and expressed doubts about whether chiropractic treatment "is of value [at] this point."

The plaintiff's own account of his condition corroborates the less optimistic assessment provided by Dr. Bjorn, compared to the more favorable assessment reflected in Dr. Arsenault's notes. At trial, the plaintiff testified that prior to the June 2001 accident, he had recovered from the March 2000 accident to the point where he was able to play with young members of his family and more generally increase the level of his activities, including exercise. However, when he was deposed prior to trial, he stated that he had not actually begun to increase those activities. Rather, he anticipated that he would progress in his recovery and that with that improvement, he would be able to

2

engage in such activities. Additionally, during a session with Dr. Arsenault three days prior to the accident at issue here (in fact, the plaintiff's last visit prior to that collision), the plaintiff reported an increase in pain, which he described as constant. Thus, the court finds that immediately prior to the June 2001 accident, the plaintiff was still quite debilitated from the March 2000 incident.

As is noted above, the June 2001 incident did not create a new injury to the plaintiff's upper back; rather, it aggravated the plaintiff's pre-existing injury. An MRI study taken in early 2002 revealed no pathology to his cervical spine. In his ongoing contact with Dr. Arsenault immediately subsequent to the collision, he reported a spike in the level of his pain, particularly with activity. However, within a month following the accident, Dr. Arsenault's reports demonstrate a steady pattern of improvement, based on the plaintiff's own reports to him.[1] In July 2001 (the month following the accident at issue here), the plaintiff was examined by a pain specialist, Dr. Zolper, who noted that chiropractic intervention had been "moderately successful," although not fully satisfactory. Dr. Zolper found that the plaintiff's physical condition was normal, although the plaintiff reported some pain in his upper left back. Dr. Zolper diagnosed the plaintiff with "whiplash" and assessed "persistent musculoskeletal pain." He then prescribed several medications, which, as it turned out, the plaintiff was unable to afford. As of October 2001, when Dr. Zolper saw the plaintiff again, the plaintiff's condition had not changed: he continued to have left neck and shoulder pain, although physiologically he appeared normal. Dr. Zolper prescribed a different pain medication and "encouraged

---

[1] The reports generated by Dr. Arsenault's treatment of the plaintiff include self-reports from the plaintiff in both quantitative and qualitative terms. It is difficult to place considerable weight on the latter because they tend not to correspond to the more descriptive reports that the plaintiff provided to Dr. Arsenault. The forms on which the plaintiff reported the level of his pain generally indicate pain levels in the area of 4 (on a scale of 1 to 10), and on the same form, the plaintiff reports that the pain level is unchanged. However, on the treatment report written by Dr. Arsenault, he consistently notes that the plaintiff reports continuous improvement. The court gives greater weight to the latter because they appear to consist of information that the plaintiff provided to Dr. Arsenault in an interactive setting where he can interview the plaintiff and discuss the plaintiff's condition, and because there is some inevitable lack of precision in any attempt to quantify the unquantifiable (namely, pain), as shown in the differences in the two types of reports and in the numbers actually used by the plaintiff (for example, a 3.5, a 3.7, a 4.0, etc.).

3

him to remain active." In March 2002, Dr. Zolper conducted his final examination of the plaintiff and rendered a diagnosis of "chronic whiplash syndrome" that originated with the March 2000 accident but that was aggravated in the collision at issue here. Dr. Zolper recommended use an electrical stimulation device and, if that failed, a topical medication.

Throughout the duration since the June 2001 accident, the plaintiff has received regular chiropractic treatment from Dr. Arsenault. As the court observes in note 1, the most probative aspects of Dr. Arsenault's reports portray the plaintiff as a patient whose back condition has improved consistently and steadily throughout the time he has received that chiropractic care. Although the plaintiff's efforts to quantify the level of his pain, when those numbers are taken in isolation, suggest pain that is constant in magnitude, other measures of assessment suggest that the plaintiff's condition has improved materially. It appears that in March 2003, Dr. Arsenault changed the format of his progress notes, which then reflect the plaintiff's condition and prognosis, and the treatment provided to him for each office visit. It is remarkable that each of those reports, including the one for a visit as recent as the first hearing date in this case, includes a notation by Dr. Arsenault that the plaintiff's prognosis is excellent. When examined on this issue at trial, Dr. Arsenault stated that his prognosis had been for an excellent recovery but that this expectation had not been realized and, instead, the plaintiff has already achieved the maximum level of recovery. However, the court finds it difficult to reconcile this bleaker assessment of the plaintiff's future as provided through testimony, with the bright prognosis memorialized consistently and recently in Dr. Arsenault's records. Further, the court cannot ignore Dr. Arsenault's assessment, recorded in office notes dated September 12, 2002, April 29, 2003, and as recently as December 8, 2003, that the plaintiff's overall condition was "excellent." This cannot be seen as supportive of the plaintiff's testimony that his back condition limits his physical activities in a substantial way, that restful activities such as sitting and laying in bad produce debilitating pain and that the pain in his back is constant.

The plaintiff continues to obtain chiropractic treatment from Dr. Arsenault. None of the evidence suggests that this treatment will operate to improve his condition on a long-term basis. Rather, both the plaintiff and Dr. Arsenault testified that the sole purpose for these ongoing sessions is to provide the plaintiff with temporary relief from

4

his back pain. It appears to the court that the plaintiff may have a sensitive constitution,[2] and, for this reason, the court is willing to accept that the treatments provided up to the present are justifiable because they have provided temporary relief from pain although they have not led to a structural cure. This means that the plaintiff is entitled to recover chiropractic expenses beyond the amount urged by the defendants. The amount of medical expenses to which the plaintiff is entitled to recover, however, excludes the chiropractic care that Dr. Arsenault provided to him during the six months immediately following the June 2001 accident. Dr. Arsenault testified that as of that accident date, the plaintiff was to continue with approximately six additional months of care for the condition caused by the March 2000 accident. Further, the frequency of treatments did not increase as a result of the June 2001 accident. Thus, the evidence establishes that the chiropractic expenses that the plaintiff incurred between June 17, 2001, and the end of that year were not legally caused by the June 2001 accident, because the plaintiff was going to incur those very expenses irrespective of the defendants' fault. This reduces the plaintiff's claim for past chiropractic expenses by $2,385, to $2,305. The remaining medical expenses incurred by the plaintiff following the June 2001 accident are fairly attributable to that event, and he is entitled to recover those amounts in full.[3] The cumulative amount of those additional expenses is $2,475. The plaintiff's total recoverable medical expenses are therefore $4,780.

With respect to the plaintiff's claim for future pain and suffering, future impairment and future chiropractic expenses, in light of Dr. Arsenault's optimistic prognosis and the steady history of improvements, recorded in short intervals of time, the court is unable to conclude that the plaintiff has proven that his condition is permanent. In assessing the evidence in this way, the court has taken into consideration Dr. Arsenault's testimony to the contrary. Nonetheless, for the reasons noted above, other

---

[2] For example, the evidence (including the plaintiff's own testimony on this point and medical records) indicates that when the plaintiff was examined by a pain specialist for the injuries sustained in the 2000 accident, he (the plaintiff) declined the physician's recommendation for a medication that would be injected, because the plaintiff does not like needles.

[3] The defendant does not contest an award of the non-chiropractic expenses claimed by the plaintiff.

evidence raises significant questions about the accuracy of this prognosis. For the reasons noted above, the court finds that the plaintiff continues to experience some pain caused by the June 2001 aggravation of the March 2000 injury. It is reasonable to infer that this condition will continue for some period of time into the future. However, the steady rate of improvement noted by Dr. Arsenault, the plaintiff's excellent prognosis ascribed to him by Dr. Arsenault and the plaintiff's overall "excellent" condition, assessed at different points over a large period of time, combine to prevent the court from finding that his future pain and suffering is substantial.

Further, both the pain and suffering that the plaintiff has experienced to date, and the limited degree of future damages are, in Dr. Arsenault's own view, partly attributable to the March 2000 accident. The chiropractor concluded that the June 2001 is the cause of somewhat more than half (60%) of the plaintiff's current problems and that the balance can be ascribed the original insult. The defendants bear the burden of proving any allocation between the components of a single injury, that is, separating the effects of the initial trauma from any subsequent aggravation. *See Lovely v. Allstate Ins. Co.*, 658 A.2d 1091, 1092 (Me. 1995). The evidence presented in this case does not call this aspect of Dr. Arsenault's assessment into substantial question. Although there may be some level of imprecision in the exercise of segregating the elements of a single injury, in this case, it is supported at least generally by evidence that in June 2001 the plaintiff was still suffering from the effects of the 2000 injury, that there had been some improvement and that the plaintiff legitimately has received treatment longer than he probably would have received in the absence of the 2001 incident.

Based on this evidence, the court awards the plaintiff compensatory damages in the sum of $20,000.

The entry shall be:

For the foregoing reasons, judgment is entered for the plaintiff and against the defendants, jointly and severally, in the amount of $20,000; pre-judgment interest at the annual rate of 8%; post-judgment interest at the annual rate of 7.41%; and his costs of court.

6

Dated: February 20, 2004

_____
Justice, Maine Superior Court
Jeffrey L. Hjelm

7

TORVIC VARDAMIS - PLAINTIFF
18 DAVIS ROAD
BANGOR ME 04401
Attorney for: TORVIC VARDAMIS
N LAURENCE WILLEY JR
WILLEY LAW OFFICES
15 COLUMBIA STREET, SUITE 501
PO BOX 924
BANGOR ME 04402-0924

SUPERIOR COURT
PENOBSCOT, ss.
Docket No   BANSC-CV-2003-00073

**DOCKET RECORD**

vs
AMY SMITH   - DEFENDANT
P O BOX 6353
HERMON ME 04401
Attorney for: AMY SMITH
BRUCE MALLONEE
RUDMAN & WINCHELL
84 HARLOW ST
PO BOX 1401
BANGOR ME 04402-1401

PERFORMANCE FINSHES INC - DEFENDANT
1594 HAMMOND STREET
BANGOR ME 04401
Attorney for: PERFORMANCE FINSHES INC
BRUCE MALLONEE
RUDMAN & WINCHELL
84 HARLOW ST
PO BOX 1401
BANGOR ME 04402-1401

Filing Document: COMPLAINT
Filing Date: 05/06/2003

Minor Case Type: AUTO NEGLIGENCE

**Docket Events:**

05/06/2003 FILING DOCUMENT - COMPLAINT FILED ON 05/06/2003

05/06/2003 Party(s):  TORVIC VARDAMIS
          ATTORNEY - RETAINED ENTERED ON 05/06/2003
          Plaintiff's Attorney: N LAURENCE WILLEY JR

05/06/2003 Party(s):  AMY SMITH
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 05/06/2003

05/06/2003 Party(s):  AMY SMITH
          SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 05/01/2003
          OFFICER'S RETURN OF SERVICE AS TO DEFENDANT AMY SMITH.  (BY:  BRANDY SMITH)

05/06/2003 Party(s):  PERFORMANCE FINSHES INC
          SUMMONS/SERVICE - CIVIL SUMMONS FILED ON 05/06/2003

05/06/2003 Party(s):  PERFORMANCE FINSHES INC
          SUMMONS/SERVICE - CIVIL SUMMONS SERVED ON 05/01/2003
          OFFICER'S RETURN OF SERVICE AS TO DEFENDANT PERFORMANCES FINISHES, INC.  (BY:  KEVIN